UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x

CARLOS JIMENEZ, individually and
on behalf of Brazil Ethanol, Inc.,

         Plaintiff,

     -against-

BRAZIL ETHANOL, INC., FREDERICO
ROBALINHO, RUBENS BARBOSA,
JORGE CANTONNET, JP2 TECHNOLOGIA &
FINANCAS LTDA, JOSE MONTEIRO,
GREGORIO MARANHAO, GRUPO EQM,
KELBE PARTICIPACOES LTDA., and
GLOBAL CAPITAL NETWORKS LLC.,

         Defendants.

-----------------------------------x

11-CV-3635 (LBS, RLE)
    ECF Case

FIRST AMENDED COMPLAINT

Jury Trial Demanded



Carlos Jimenez ("Plaintiff"), by his undersigned attorney,

for his Complaint herein, alleges as follows:

1. Plaintiff brings this action individually and on behalf

of Brazil Ethanol, Inc. ("BEI"), amongst other things, to:

    a. enforce certain contractual obligations owed by

Defendants EQM and Kelbe;

    b. stay a certain sale (the "Sale") of BEI's assets,

inasmuch as shareholder consent thereto was induced by

fraud;

    c. recover damages on behalf of BEI by reason of a $1.5

million embezzlement by Defendants Robalinho, Cantonnet,

Maranhao and others;

d. recover damages on behalf of BEI from Defendant
Robalinho by reason of a $15 million loss in connection with
the attempted acquisition of a company named Petribu;

e. recover roughly $535,000 in compensation due
Plaintiff from BEI;

f. recover $500,000 in compensation due Plaintiff from
Global Capital Networks LLC.

As shown below, defendants' misconduct has required brought BEI,
a viable business, to the point of liquidation.

The Parties

2. Plaintiff is a citizen of the State of Florida.

a. Plaintiff is trained as a chemical engineer;

b. With respect to to BEI:

i.   For two years, he was a member of the board
of BEI;

ii.  For one year, he was an officer of BEI,
namely Director of Strategy and Acquisitions.

c. With respect to Global Capital Networks, Plaintiff
performed consulting work described below.

3. On information and belief, Defendants are as follows:

a. BEI is a Delaware corporation with its principal
place of business in New York, New York.  BEI is in the

2

business of making principal investments in ethanol, sugar
and sugar cane companies.   BEI is a so-called Special
Purpose Acquisition Vehicle subject to special rules issued
by the Securities and Exchange Commission.

b. four directors and/or officers of BEI (the "Director
Defendants"):

      i.   Frederico Robalinho ("Robalinho") resides in
Rio de Janeiro, Brazil and is the Chief
Executive Officer of BEI.   Robalino is a
former Secretary of Commerce of Brazil;

      ii.  Jorge Cantonnet ("Cantonnet") resides in New
York, and is the Chairman of the Board of BEI
and its President.   Cantonnet is an
investment banker, who was formerly in the
employ of Bear Stearns;

      iii.  Gegorio Maranhao ("Maranhao"), a citizen
of Brazil, had been Director of Brazil's
ethanol and sugar institute.   At the
time of the embezzlement hereinafter
described, Maranhao was a partner at JP2
and a director of BEI.   Maranhao
received some of the proceeds of the
embezzlement.

3

        iv.  Rubens Barbosa ("Barbosa") resides in Brazil and was a director of BEI from March '08 to October '08.  Barbosa is a former ambassador from Brazil to the U.S. and England.

c. The three consultant defendants (the "Consultant Defendants") are as follows:

        i.  JP2 Technologia & Financas Ltda ("JP2") is, on information and belief, a limited liability company organized and existing under the laws of Brazil, with its principal offices in Brazil.  JP2 is in the business of acting as consultants in matters having to do with commodities such as sugar, alcohol and sugar cane.  It acted as consultant to BEI in connection with BEI's acquisitions; and

        ii.  Jose Monteiro ("Monteiro") is a citizen of Brazil.  Monteiro is a partner of JP2. Monteiro knew of the embezzlement and transmitted the funds to the embezzlers.

        iii.    Defendant Maranhao, who is described above.

d. Two defendants who purchased BEI's assets (the "EQM Defendants"):

      i.    Grupo EQM is a Brazilian company with its principal place of business in Brazil;

     ii.    Kelbe Participacoes Ltda. ("Kelbe") is a subsidiary of Grupo EQM.  Kelbe is a limited liability company organized and existing under the laws of Brazil, with its principal place of business in Brazil.  On information and belief, none of the members of Kelbe are citizens of Florida.

e. a former employer Global Capital Networks LLC ("Global Capital Networks"), a New York limited liability company which provides investment banking services, and whose members include Cantonnet, a citizen of New York, and possibly others from states other than Florida.


Jurisdiction and Venue

4. This Court has subject matter jurisdiction over Plaintiff's claims inasmuch as:

a. the parties are of diverse citizenship;

b. the claim raises questions arising under the Securities Act of 1933 and the Securities and Exchange Act of 1934 and the rules promulgated thereunder, including:

      i.    § 78n of the '34 Act,

      ii.   17 C.F.R. §§ 240.14d-1, and

      iii.      Rule 10b-5

5. Venue is properly laid in the Southern District of New York, inasmuch as the conduct complained of was taken at BEI's office in New York.

6. The Court has jurisdiction over the persons of the defendants.  Amongst other things, such defendants:

      a. did and transacted business in New York;

      b. committed tortious acts without the state causing injury to persons and property within the state.

Overview of Transactions

7. Establishment of BEI.  Around 2006, BEI was established to acquire Brazilian companies involved in the production of ethanol and sugar, with a view to selling those commodities, especially in the U.S.  BEI has:

      a. three founding shareholders, namely

          i.   Defendant Robalinho, who owns 10%;

          ii.  Defendant Cantonnet, who owns 8%;
and

          iii.      Plaintiff, who owns 2%;

      b. roughly thirty-three institutional investors, who invested roughly $95 million in a private placement by BEI.

8. <u>Establishment of BEI's Subsidiary</u>.  Around 7/1/07, BEI established a wholly owned subsidiary in Brazil ("BEPSA") to acquire Brazilian producers of sugar.

9. <u>Attempt to Acquire Petribu</u>.  Around 2008, BEI made an abortive attempt to purchase a Brazilian company named Petribu, which attempt resulted in the forfeiture of a $15 million deposit.

10. <u>Acquisition of Leao</u>.  Around March 2008, BEI caused its subsidiary BEPSA to acquire a Brazilian sugar producer named S.A. Leao e Inmaos Acucar e Alcool ("Leao").

11. <u>Sale of the 60% Interest in Leao</u>.  Around July 2009, pursuant to a proxy solicitation (the "2009 Proxy Solicitation"), BEP sought shareholder consent to cause its subsidiary BEPSA to sell 60% of BEPSA's interest in Leao to Defendant Kelbe for a purchase price of $50 million. The shareholders gave their consent, and pursuant thereto, BEI entered into a Subscription Agreement with the EQM Defendants effecting the sale of the 60% interest.  Thus, following the sale:

      a. Defendant Kelbe owned 60% of Leao; and

      b. BEI, through BEPSA, owned 40% of Leao.

12. <u>Sale of Remaining 40% Interest in Leao</u>.  Around 4/9/10, BEI obtained shareholder consent, pursuant to a so-called Consent Solicitation, to sell BEPSA's 40% interest in Leao to Defendant

Kelbe.

13. As of the date of this Complaint, the sale of the 40% interest is only partially consummated, and Plaintiff sues to enjoin the completion of the sale.

14. As shown below, both the 2009 Proxy Solicitation and the Consent Solicitation contained false and misleading statement and material omissions.  Amongst other things, these materials failed to reveal that certain defendants hereinafter named had embezzled $1.5 million, representing 10% of BEI's working capital.

Breach of the Subscription Agreement

15. The EQM Defendants breached the Subscription Agreement whereby Kelbe acquired the 60% interest in Leao.  BEI itself notes the breach in the subsequently prepared Consent Solicitation.

16. Amongst other things, the Consent Solicitation reflects that:

   a. the EQM Defendants failed to provide information about Leao which it obligated to provide, and in particular, had failed to provide a recent balance sheet, income statement or cash flow statement;

   b. the EQM Defendants failed to make the required financial investments in Leao;

8

    c. BEI gave consideration to suing to obtain information about the circumstances of Leao.

## The Embezzlement

17.  Plaintiff has learned of facts showing that in or about March 2008, Robalinho, Cantonnet, Maranhao, Monteiro and JP2 (the "Embezzlement Defendants), acting individually and in concert with each other, embezzled $1.5 million, representing roughly 10% of BEI's working capital.

18. The embezzlement scheme was to cause BEI to pay purported commissions to JP2, and then take a kickback.  The facts are as follows:

    a. By 12/20/06, BEI had already sent letters of intent to several acquisition targets.  These included  i) a 10/10/06 Letter of Intent to TB Agro Industrial; ii) a 10/28/06 Letter of Intent to Estreliana and Destilaria Liberdade; iii) an 11/20/06 Letter of Intent to Bulhoes; and iv) a 12/20/06 Letter of Intent to Leao;

    b. On 1/18/07-- _i.e.,_ <u>after</u> BEI had learned of those targets, BEI signed a brokerage agreement claiming that JP2 had introduced those companies to BEI, and entitling JP2 to millions of dollars in brokerage commissions;

    c. But it so happened that BEI acquired only Leao, thus

9

limiting the embezzlers to a kickback from the Leao acquisition.

d. Thus, on or about March 2008, the Embezzlement Defendants caused BEI to pay roughly $1.5 million to JP2;

e. JP2 kept a portion of the payment, and JP2 partner Monteiro transferred the remainder to Director Defendants Robalinho, Cantonnet and Maranhao;

19. The payment is reflected in BEI's records.  For example:

a. Financial documents prepared by BEI's controller reflect that in March 2008, BEI paid JP2 the sum of Real 2,360,327.50, or about $1.5 million.

b. Similarly, a 2/27/08 e-mail, a director named Eduardo Froes states to Cantonnet that:

> "Monteiro dumped all his ammunition on us
> yesterday, basically all the stuff he has
> done with the mills in Pernambuco that were
> presented in the first Road Show.  He is
> about to get a lot of cash from us due to his
> part in the Leao sale.  I believe his [sic]
> very keen to get this deal done."

20. The fraudulent nature of the payment is reflected in the following:

a. Robalinho was already acquainted with Leao, and didn't have to pay a commission for the introduction. In particular, Robalinho had worked on building a power plant on or next to Leao's lands, and knew the company well;

b. Jose Leao, who negotiated and represented the Leao family in the negotiations with BEI, denied having any contact with JP2.  He stated that the introduction of BEI to Leao, the company, was made through Brazil Energy, a company owned by Robalinho that leased lands from Leao, the company, to install a power generation plant.  Furthermore, Jose Leao stated that some time after Leao, the company, leased lands to Brazil Energy, Brazil Energy expressed its interest in acquiring Leao.  In addition, Jose Leao stated that, as the legal representative of the sellers in the sale process, he dealt exclusively with Robalino and Cantonnet, who represented BEI.

c.  As noted above, BEI agreed to pay JP2 millions of dollars in brokerage commissions for identifying companies that BEI had already sent letters of intent to.  The brokerage agreement required at ¶ 1.3 that JP2 furnish a memo regarding Leao, and that it participate in the due diligence regarding Leao.  Plaintiff made repeated demands for the work product required by the agreement, but BEI was only able to produce work product created <u>after</u> BEI had already written the 12/20/06 Letter of Intent to Leao-- i.e., after BEI was already considering Leao as an acquisition target.

d. The 1/18/07 brokerage agreement purports that JP2 had made introductions to targets besides Leao, when that wasn't the case.  Those other targets include Usina Estreliana, Usuina Bulhoes, TG Agroindustrial, and Destilaria Liberdade;

e. Around March 2008, Defendant Maranhao boasted of receiving 400,000 Real-- about $250,000-- from JP2.  There was no legitimate reason why Defendant Maranhao would have received any such payment from JP2.

f. in a 12/10/07 proxy solicitation, the Director and Embezzlement Defendants concealed the size of the payment to JP2, which would have raised questions, by lumping it in with payments to seven other vendors;

g. Plaintiff has been informed that the purchase and sale agreement between BEI and the owners of Leao identifies the recipients of commissions: they are i) Cezar Trombelli (Leao's general manager) and ii) Andrea Maranhao (Leao's lawyer), not to be confused with Defendant Maranhao herein. Nowhere is JP2 identified as receiving a commission.

h. At the initial visit by BEI to Leao, JP2 was not present.  Normally, a broker insists on being present so that he can establish that he made the introduction;

i. Plaintiff knew of no role by JP2 in identifying Leao

12

as an acquisition target.  As the Director of Strategy and Acquisition, Plaintiff would have known of any role by JP2 in identifying Leao as an acquisitions target;

j. In a 3/30/11 conversation between Plaintiff and Carlos Loumiet, BEI's lawyer at Hunton & Williams, Loumiet stated that he was not aware of any commission being paid to JP2, meaning that the $1.5 million payment to JP2 was not the payment of a commission.  Loumiet further stated that had such a commission been paid, it needed to have been identified as such in the proxy solicitation;

k. the 12/10/07 Proxy Solicitation seeking consent from BEI's shareholders to acquire Leao:

      i.    identifies the major consultants that played a role in the acquisition, but does not identify JP2 as playing any role;

      ii.   sets forth the views of the various consultants involved in the acquisition, but does not contain any views of JP2;

l. BEI was advised and guided by its lawyer Carlos Loumiet ("Loumiet"), at the time a partner at the law firm Hunton & Williams.  On information and belief, Loumiet has been associated with two nationally-prominent securities frauds-- namely, frauds committed by Hamilton Bank and

Stanford Financial, respectively.

      i.   <u>Hamilton Bank</u>.  Loumiet was the lawyer for Hamilton Bank, which failed in 2002.  The bank's failure cost the federal insurance fund $127 million and sent three officers of Hamilton Bank to jail.  Around 11/6/06, the Office of the Comptroller of the Currency filed a complaint against Loumiet.  The OCC alleged that around 2002 Loumiet, at the request of the Bank's audit committee, prepared a report investigating criminal activities of the three officers.  According to the OCC, Loumiet's report contained false and misleading statements, and suppressed information damaging to the officers.  The OCC further alleged that after the issuance of Loumiet's report, the Bank paid $1.6 million to Loumiet's firm Greenberg Traurig, which Loumiet shared in.  The OCC sought to recover a penalty of $250,000 and to enjoin Loumiet from similar conduct.  Ultimately, Loumiet was cleared of wrongdoing by an administrative law judge.

  ii. <u>Stanford Financial</u>. Subseqently, Loumiet was the lawyer for Stanford Financial, which managed US$8.5 billion of assets for more than 30,000 clients in 136 countries on six continents..  On 2/17/09, the U.S. Government placed Stanford Financial in receivership because of charges of fraud.  On February 27, 2009, the U.S. Securities and Exchange Commission filed a complaint describing the alleged fraud as a "massive Ponzi scheme". Loumiet was asked to produce documents of his communications with Stanford Financial, but declined, asserting the attorney-client privilege.

21. Robalino made false statements to conceal the embezzlement.  For example:

 a. In a 2/16/09 message to shareholders, Robalinho stated:

"I receive no compensation whatsoever, either as a shareholder or as CEO."

 b. Robalinho stated to a director named Eduardo Froes that JP2 had earned the money for work in connection with the acquisition of Leao.

15

22. Barbosa knew, or in the exercise of due care should have known, of the embezzlement.  At a board meeting, when Barbosa learned about the payments to JP2, he expressed surprise and disgust.  Barbosa asked Robalinho why the payment to JP2 was so high, but after Robalinho made a dismissive statement, failed to pursue the matter further.

The Fraudulent Solicitations

23. The Director Defendants (except for Defendant Barbosa), acting in concert with each other, undertook to conceal the embezzlement from shareholders and others in soliciting their consent to major securities transactions, and in consummating such transactions.

24. The solicitations were all reviewed and approved by BEI's lawyer Carlos Loumiet, who, as noted below, is associated with two other nationally-prominent frauds.

25. Needless to say, the embezzlement was not disclosed in either the:

    a. 2009 Proxy Solicitation used to obtain shareholder consent for the sale of the 60% interest in Leao to Defendant Kelbe; or the

    b. Consent Solicitation used to obtain shareholder consent for the sale of BEI's 40% interest to Defendant

16

Kelbe and the liquidation of BEI.

26. The embezzlement was a material fact.  The $1.5 million represented 10% of BEI's working capital, at a time when BEI's operations were hampered by a lack of working capital.  For example:

    a. in the Consent Solicitation, BEI stated that it was so short of working capital that it was unable to pay important vendors, such as its accountant KPMG.

    b. In a 9/22/09 message to shareholders, Cantonnet stated that BEPSA and BEI were unable to pay salaries.

    c. And the Consent Solicitation asserted that, because of that shortage, the sale to Kelbe and liquidation of BEI was the only prudent course.

And as discussed later, the embezzlement had disastrous consequences for BEI.


The Petribu Acquisition

27. In or about 2008, at the behest of JP2, Defendant Robalinho caused BEI to enter into an agreement to purchase a company named Petribu.

28. In connection with the acquisition BEI borrowed approximately $20 million from a bank, and hoped to borrow the balance of the purchase price from United Bank of Switzerland.

29. Acting negligently and in breach of his fiduciary duties, Defendant Robalinho caused BEI to agree to pay a $15 million <u>non-refundable</u> deposit to the sellers of Petribu.

30. But ultimately, BEI was unable to borrowing the balance of the purchase price.

31. As a result, BEI forfeited the $15 million deposit paid to Petribu.


<u>Compensation Due Plaintiff</u>

32. BEI agreed to compensate Plaintiff $535,000 for his service as a director and officer:

    a. For his services for two years as a board member, BEI agreed to compensate Plaintiff at the rate of $USD 120,000/yr., for a total of $240,000;

    b. For his services for one year as an officer-- viz., Director of Strategy and Acquisitions-- BEI agreed to compensate Plaintiff at the rate 500,000 real per year, or, at the conversion rate in effect on 3/20/11, $295,000.

33. The rate of pay for Plaintiff's services as an officer is acknowledged in a 11/19/08 e-mail from Cantonnet to Robalinho which states:

> "Carlos Jimenez is Director of Strategy and
> Acquisitions, current Interim CFO and a director of
> Brazil Ethanol.  He is owed base salary compensation at

the rate of R$500,000 from March 6, 2008 (the date of the acquisition of Leao) to the present."

34. Similarly, the 4/19/10 Consent solicitation states:

"As of the date of this Consent Solicitation the accrued, unpaid fees to each person are set forth below:
. . .
Carlos F. Jimenez   $417,376"

35. Plaintiff served as a director from March '08 until the date of this complaint, and is therefore owed $535,000.


Compensation from Global Capital Networks

36. Prior to becoming involved with BEI, Cantonnet, on behalf of Global Capital Networks, retained Plaintiff to perform certain valuation services.  Global Capital Networks was itself advising China National Chemical Corp. ("ChemChina") in possible acquisitions.  One prospective target was Thai Petrochemical Industry Co. ("Thai Petrochemical").

37. In connection therewith, Global Capital Networks hired Plaintiff to provide a valuation of Thai Petrochemical and to provide a strategy for the acquisition.

38. Cantonnet and Global Capital Networks agreed that Plaintiff's compensation would be $500,000.

39. Plaintiff performed the work and his work product was used by Global Capital Networks.

40. But, despite repeated demand by Plaintiff, Global Capital Networks failed and refused to pay Plaintiff.

<u>Damages</u>

41. <u>BEI Damages</u>.  By reason of the foregoing, BEI has suffered extensive damages, which can not at present be quantified, but which include the following.

42. As a result of the breach of the Subscription Agreement by Kelbe, BEI suffered damages not less than a $43.8 million loss, described below, in connection with the sale of BEI's 40% interest in Leao.  As noted above, the breach of the Subscription Agreement was one of the causes of the sale at distress prices of BEI's 40% interest.

43. As the result of the embezzlement, BEI sustained a loss of not less than $45.3 million:

a. The $1.5 million embezzlement constituted roughly 10% of BEI's working capital, a loss which ultimately required the liquidation of BEI.

b. In BEI's quarterly report for the last quarter of 2008, Robalinho himself lamented the lack of working capital and catalogued its disastrous effects:

"we are facing huge difficulties <u>in obtaining working capital</u> and financing.  One of the annual payments to the former owners of Leao Mill was overdue in March

2009.  Lack of credit forced us to enter into a long
and exhaustive negotiation with our creditors who
finally accepted payment in land.... we have been
delaying several payments and in April, due to lack of
money we delayed paying the Mill's employees' payroll
for a few days. ... our workers protested strongly
going on strike, blocking a highway, setting tires on
fire and threatening drives....   As I have stated on
several occasions... <u>our main problem is the lack of
working capital</u>" (emphasis supplied).

c. The lack of working capital required a distress sale

of BEI's 60% interest in Leao to Defendant Kelbe.  That is,

at the end of 2008, Leao's equity value was $123 million.  A

60% stake in Leao was therefore worth $73.8 million.  But in

2009, as the result of lack of working capital, BEI was

forced to sell a 60% interest in Leao for a $30 million,

reflecting loss to BEI of $43.8 million.

d. In addition to the loss of $43.8 million, as the

result of the embezzlement, BEI lost the $1.5 million

embezzled by Robalhino;

44. As the result of the Petribu acquisition, BEI lost the

$15 million down payment paid to Petribu.

45. <u>Plaintiff's Damages</u>.  By reason of the foregoing,

Plaintiff in his individual capacity has suffered extensive

damages, which can not at present be quantified, but which

include:

a. loss of compensation from BEI in the amount of

21

$535,000;

b. loss of compensation from Global Capital Networks in the amount of $500,000.

Rule 23.1(b) Allegations

46. At the time of the transactions complained of, Plaintiff was a shareholder of BEI.

47. The action is not a collusive one to confer jurisdiction on this Court which it would not otherwise have.

48. By letter dated ___, Plaintiff made demand on BEI to bring a law suit asserting the claims set forth herein.  However, BEI failed to take such action.

AS AND FOR A FIRST CAUSE OF ACTION (Breach of Subscription Agreement by EQM Defendants)

49. Plaintiff repeats each of the foregoing allegations with the same force and effect as if fully set forth herein.

50. The Subscription Agreement was an enforceable contract between BEI and the EQM Defendants.

51. The EQM Defendants, by their conduct, breached the agreement.

52. By reason of such breach, BEI suffered the aforementioned damages.

22

<u>AS AND FOR A SECOND CAUSE OF ACTION (Fraud by Embezzlement</u>
<u>Defendants)</u>

30. Plaintiff repeats each of the foregoing allegations with the same force and effect as if fully set forth herein.

53. The perpetration of the aforementioned scheme by the Embezzlement Defendants constituted acts of fraud. Amongst other things,

     a. the Embezzlement Defendants purported that JP2 was entitled to the payment, when in fact JP2 was participating in a scheme to embezzle from BEI;

     b. such defendants knew that the payment had not been earned by JP2;

     c. such defendants made the aforementioned false or incomplete statements to conceal their wrongdoing;

     d. BEI's other directors and officers reasonably relied on the false impression that the payment was for services performed by JP2;

54. By reason of such reliance, BEI suffered the aforementioned damages.

<u>AS AND FOR A THIRD CAUSE OF ACTION (Breach of Fiduciary Duty by</u>
<u>Embezzlement Defendants)</u>

55. Plaintiff repeats each of the foregoing allegations

with the same force and effect as if fully set forth herein.

56. By reason of the parties' relationships, the Embezzlement Defendants owed Plaintiff and BEI a fiduciary duty.

57. By their conduct, such defendants breached that duty.

58. As a result of the breach, BEI and Plaintiff suffered the above-mentioned damages.

### AS AND FOR A FOURTH CAUSE OF ACTION (Inducement of Breach of Fiduciary Duty)

59. Plaintiff repeats each of the foregoing allegations with the same force and effect as if fully set forth herein.

60. By reason of the parties' relationships, the Embezzlement Defendants owed Plaintiff and BEI a fiduciary duty.

61. By their conduct, each of the Embezzlement Defendants induced the breach of each other defendant's fiduciary duty.

62. By reason thereof, Plaintiff and BEI suffered the above-mentioned damages.

### AS AND FOR A FIFTH CAUSE OF ACTION (Unjust Enrichment Embezzlement)

63. Plaintiff repeats each of the foregoing allegations with the same force and effect as if fully set forth herein.

64. By reason of the foregoing, Robalinho, Cantonnet, Maranhao, Monteiro and JP2 were unjustly enriched in an amount

not less than $1.5 million.


## AS AND FOR A SIXTH CAUSE OF ACTION (Negligence Embezzlement)

65.   Plaintiff repeats each of the foregoing allegations with the same force and effect as if fully set forth herein.

66. The Director Defendants, Monteiro and JP2 owed BEI and its shareholders a duty of care.

67. Such defendants breached that duty by failing to discover the embezzlement.

68. By reason of such breach Plaintiff and BEI suffered the above-mentioned damages.


## AS AND FOR A SEVENTH CAUSE OF ACTION (Securities Fraud 2009 Proxy Solicitation)

69.   Plaintiff repeats each of the foregoing allegations with the same force and effect as if fully set forth herein.

70. By reason of the foregoing, the 2009 Proxy Solicitation contained misrepresentations and  material omissions of fact.

71. Such misrepresentations and omissions violated the securities laws, including the Securities Exchange Act of 1934.

72. BEI and its shareholders believed the statements therein to be true and complete.

73. Acting in reliance thereon, BEI, Plaintiff and the other

25

shareholders consented to the aforementioned sale to the EQM

Defendants.

74. By reason thereof, BEI, and its shareholders suffered

the above-mentioned damages.


AS AND FOR A EIGHTH CAUSE OF ACTION (Common Law Fraud 2009 Proxy
Solicitation)


75.  Plaintiff repeats each of the foregoing allegations

with the same force and effect as if fully set forth herein.

76. By reason of the foregoing, the 2009 Proxy Solicitation

contained misrepresentations and  material omissions of fact.

77. Such misrepresentations and omissions violated the

common law of fraud.

78. Acting in reliance thereon, BEI, Plaintiff and the other

shareholders consented to the acquisition of Leao.

79. By reason thereof, BEI, and its shareholders suffered

the above-mentioned damages.


AS AND FOR A NINTH CAUSE OF ACTION (Negligent Misrepresentation
2009 Proxy Solicitation)

80.  Plaintiff repeats each of the foregoing allegations

with the same force and effect as if fully set forth herein.

81. The Director and Embezzlement Defendants owed BEI and

26

its shareholders a duty of care.

82. By permitting the false and incomplete statements in the 2009 Proxy Solicitation, such defendants breached that duty.

83. By reason thereof, BEI, and its shareholders suffered the above-mentioned damages.

### AS AND FOR A TENTH CAUSE OF ACTION (Securities Fraud Consent Solicitation)

84.  Plaintiff repeats each of the foregoing allegations with the same force and effect as if fully set forth herein.

85. By reason of the foregoing, the Consent Solicitation contained misrepresentations and  material omissions of fact.

86. Such misrepresentations and omissions violated the securities laws, including the Securities Exchange Act of 1934.

87. Acting in reliance thereon, BEI, Plaintiff and the other shareholders consented to:

        a. the sale of the 40% interest in Leao;

        b. the liquidation of BEI.

88. By reason thereof, BEI, and its shareholders suffered the above-mentioned damages.

### AS AND FOR A ELEVENTH CAUSE OF ACTION (Common Law Fraud Consent Solicitation)

89.  Plaintiff repeats each of the foregoing allegations

27

with the same force and effect as if fully set forth herein.

90. By reason of the foregoing, the Consent Solicitation contained misrepresentations and  material omissions of fact.

91. Such misrepresentations and omissions violated the common law of fraud.

92. Acting in reliance thereon, BEI, Plaintiff and the other shareholders consented to:

       a. the sale of the 40% interest in Leao;

       b. the liquidation of BEI.

93. By reason thereof, BEI, and its shareholders suffered the above-mentioned damages.


## AS AND FOR A TWELFTH CAUSE OF ACTION (Negligent Misrepresentation Consent Solicitation)

94.   Plaintiff repeats each of the foregoing allegations with the same force and effect as if fully set forth herein.

95. The Director and Embezzlement Defendants owed BEI and is shareholders a duty of care.

96. By permitting the false and incomplete statements in the Consent Solicitation, the Director Defendants breached that duty.

97. By reason thereof, BEI, and its shareholders suffered the above-mentioned damages.

28

<u>AS AND FOR A THIRTEENTH CAUSE OF ACTION (Deceptive Business Practice)</u>

98.  Plaintiff repeats each of the foregoing allegations with the same force and effect as if fully set forth herein.

99. By their conduct, the Embezzlement Defendants engaged in a deceptive business practice.

100. By reason thereof, Plaintiff and BEI suffered the above-mentioned damages.


<u>AS AND FOR A FOURTEENTH CAUSE OF ACTION (Injunctive Relief)</u>

101.  Plaintiff repeats each of the foregoing allegations with the same force and effect as if fully set forth herein.

102. BEI and its shareholders will suffer irreparable damage unless the sale of the 40% interest in Leao and the liquidation of BEI are enjoined.

103. BEI and its shareholders lack an adequate remedy at law.

104. By reason of the foregoing, BEI and its shareholders are entitled to a order:

> a. enjoining such transactions;

> b. imposing a constructive trust on any assets transferred to the EQM Defendants by BEI pursuant to the above-mentioned consents.

29

<u>AS AND FOR A FIFTEENTH CAUSE OF ACTION (Negligence Petribu)</u>

105.  Plaintiff repeats each of the foregoing allegations with the same force and effect as if fully set forth herein.

106. By reason of the parties relationship, the Consultant, Director and Embezzlement Defendants owed BEI and its shareholders a duty of care.

107. By their conduct in connection with the acquisition of Petribu, such defendants breached that duty.

108. Amongst other things, such defendants suffered BEI to make the aforementioned non-refundable deposit.

109. As a result of such breach, BEI suffered the aforementioned loss.


<u>AS AND FOR A SIXTEENTH CAUSE OF ACTION (Breach of Fiduciary Duty Petribu)</u>

110.  Plaintiff repeats each of the foregoing allegations with the same force and effect as if fully set forth herein.

111. By reason of the parties relationship, the Consultant, Director and Embezzlement Defendants owed BEI and its shareholders a fiduciary duty.

112. By their conduct in connection with the acquisition of Petribu, such defendants breached that duty.

30

113. Amongst other things, such defendants suffered BEI to make the aforementioned non-refundable deposit.

114. As a result of such breach, BEI suffered the aforementioned loss.

## AS AND FOR A SEVENTEENTH CAUSE OF ACTION (Breach of Employment Contract by BEI)

115.   Plaintiff repeats each of the foregoing allegations with the same force and effect as if fully set forth herein.

116. By failing to pay Plaintiff his compensation, BEI breached the contract of employment with Plaintiff.

117. By reason of such breach, Plaintiff suffered the above-mentioned damages.

## AS AND FOR A EIGHTEENTH CAUSE OF ACTION (Unjust Enrichment by BEI)

118.   Plaintiff repeats each of the foregoing allegations with the same force and effect as if fully set forth herein.

119. Plaintiff lacks an adequate remedy at law.

120. By reason of the foregoing, BEI has been unjustly enriched in the amount of $535,000.

## AS AND FOR A NINETEENTH CAUSE OF ACTION (Breach of Employment

<u>Contract by Global Capital Networks)</u>

121.  Plaintiff repeats each of the foregoing allegations with the same force and effect as if fully set forth herein.

122. Plaintiff lacks an adequate remedy at law.

123. By reason of the foregoing, Global Capital Networks breached its contract with Plaintiff.

124. By reason of such breach, Plaintiff suffered the aforementioned damages.

<u>AS AND FOR A TWENTIETH CAUSE OF ACTION (Unjust Enrichment by Global Capital Networks)</u>

125.  Plaintiff repeats each of the foregoing allegations with the same force and effect as if fully set forth herein.

126. By reason of the foregoing, Global Capital Networks has been unjustly enriched in the amount of $500,000.

WHEREFOR, Plaintiff demands judgment in an amount not less than as follows:

| No. | Cause of Action | Compensatory Damages | Punitive Damages |
|-----|-----------------|----------------------|------------------|
| 1 | breach of Subscription Agreement by EQM Defendants | $43.8 million | 0 |
| 2 | fraud by Embezzlement Defendants | $45.3 million | $100 million |

32

| | | | |
|---|---|---|---|
| 3 | breach of fiduciary duty by Embezzlement Defendants | $45.3 million | $100 million |
| 4 | inducement of breach of fiduciary duty | $45.3 million | $100 million |
| 5 | unjust enrichment embezzlement | $1.5 million | 0 |
| 6 | negligence embezzlement | $45.3 million | $100 million |
| 7 | securities fraud by 2009 Proxy Solicitation | $45.3 million | $100 million |
| 8 | common law fraudulent inducement by 2009 Proxy Solicitation | $45.3 million | $100 million |
| 9 | negligent misrepresentation 2009 Proxy Solicitation | $45.3 million | |
| 10 | securities fraud by Consent Solicitation | $45.3 million | $100 million |
| 11 | common law fraud by Consent Solicitation | $45.3 million | $100 million |
| 12 | negligent misrepresentation Consent Solicitation | $45.3 million | $100 million |
| 13 | deceptive business practice | $45.3 million | $100 million |
| 14 | injunction | 0 | 0 |
| 15 | negligence (Petribu) | $15 million | $50 million |
| 16 | breach of fiduciary duty (Petribu) | $15 million | $50 million |
| 17 | breach of contract of employment by BEI | $535,000 | 0 |
| 18 | unjust enrichment by | $535,000 | 0 |

| | BEI | | |
|-----|-----|-----|-----|
| 19 | breach of contract employment by Global Capital Networks | $500,000 | 0 |
| 20 | Unjust Enrichment by Global Capital Networks | $500,000 | 0 |
| All | All | Attorneys fees, trial by jury, and such other and further relief as the Court deems just and proper | |

Dated: New York, NY
      July 25, 2011

_____
        Richard Pu

     120 E. 90th St., 10C
     New York, NY 10128
     (212) 427-3665 (o)